# United States Court of Appeals
## For the First Circuit

No. 10-1247

IRWIN BARKAN AND D&D BARKAN LLC,

Plaintiffs, Appellants,

v.

DUNKIN' DONUTS, INC. AND BASKIN-ROBBINS USA, CO.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux,  Senior U.S. District Judge]

Before

Boudin, Selya and Stahl, Circuit Judges.

Ronald W. Dunbar, Jr., with whom Andrew Goloboy, William Bagley and Dunbar Law P.C. were on brief for appellants.
Arthur L. Pressman with whom Jeffrey S. Brenner and Nixon Peabody LLP were on brief for appellees.

December 6, 2010

**STAHL, <u>Circuit Judge</u>**.  On February 8, 2005, Plaintiffs-Appellants Irwin J. Barkan and D&D Barkan LLC (collectively "Barkan") filed suit against Defendants-Appellees Dunkin' Donuts, Inc. and Baskin-Robbins USA, Co. (collectively "Dunkin' Donuts") in the United States District Court for the District of Rhode Island. Barkan alleged, among other claims,[1] that Dunkin' Donuts breached a contract in which it had promised to work with Barkan and the CIT Group ("CIT") to refinance Barkan's debt to CIT. At trial, the district court excluded the testimony of Barkan's expert and granted, pursuant to Federal Rule of Civil Procedure 50(a), judgment as a matter of law in favor of Dunkin' Donuts. Barkan now appeals both decisions. Because Barkan failed to present sufficient evidence of causation, we affirm the district court's judgment as a matter of law.

## I. FACTS AND BACKGROUND

### A. <u>The Evidence Presented at Trial</u>

Because this is an appeal of a judgment as a matter of law, we set forth the evidence "'in the light most favorable to' the nonmoving party." See Malone v. Lockheed Martin Corp., 610 F.3d 16, 20 (1st Cir. 2010) (quoting Espada v. Lugo, 312 F.3d 1, 2 (1st Cir. 2002)) (affirming renewed motion for judgment as a matter of law under Rule 50(b)).

---

[1]Barkan does not appeal the dismissal of any of the other claims.

In late 2001 and early 2002, Barkan became a Dunkin' Donuts franchisee when he purchased five stores for $1.5 million. Simultaneously, Barkan obtained from Dunkin' Donuts a Store Development Agreement ("SDA") giving him the right, subject to various limitations, to develop additional stores in a specified area of downtown Providence. To finance these purchases, Barkan secured several loans from CIT through a program established to facilitate financing for Dunkin' Donuts' franchisees. Pursuant to this program, Dunkin' Donuts guaranteed the loans and promised to make "cure payments" to CIT if Barkan failed to meet his obligations.

Shortly after this initial transaction, Barkan purchased three additional SDAs from Dunkin' Donuts for $100,000 each. These SDAs gave Barkan the right to open stores in other specified locations in Rhode Island. Like the Providence SDA acquired at the time of the initial transaction, these new contracts also contained various restrictions to his right to develop, including a requirement that Barkan be "qualif[ied] for expansion" under Dunkin' Donuts' "franchise performance rating system."

Pursuant to these development rights, Barkan eventually opened new stores in Burrillville, Warwick, and the Providence Place Mall. To finance this expansion and his Dunkin' Donuts franchise operations, Barkan testified that he borrowed $1.4

-3-

million from the DMS Group, which eventually sued Barkan to recover much of this allegedly unpaid debt. At about the same time, Barkan also began preparations to open a handful of additional stores in areas covered by his SDAs. These preparations included acquiring property, negotiating leases, researching neighborhoods, and navigating the zoning processes.

Throughout 2003, Barkan's existing stores struggled to satisfy Dunkin' Donuts' inspections, thereby jeopardizing Barkan's right to develop under the SDAs. Inspectors cited the stores for failing to comply with various Dunkin' Donuts regulations, including food-safety requirements.

Barkan's network of stores also struggled financially, and ultimately Barkan closed two of the locations. Throughout 2002 and 2003, Barkan repeatedly contacted Dunkin' Donuts representatives to express concern about the financial health of his operations. Barkan suggested various avenues to profitability, including restructuring his CIT loans. By the end of 2003, however, Barkan's financial difficulties had become so acute that he had ceased paying his monthly obligations to CIT, forcing Dunkin' Donuts to make cure payments.[2] Barkan also fell behind on payments to Dunkin' Donuts for royalty fees, advertising fees, and the remaining purchase price of the SDAs.

---

[2]By May 2004, Dunkin' Donuts had made roughly $160,000 in cure payments to CIT.

Finally, in June 2004, Dunkin' Donuts and Barkan entered into a Settlement Agreement ("Agreement") in an effort to resolve the disputes that had arisen between them and to improve the financial condition of Barkan's operations. Under the Agreement, Barkan promised to, among other things, timely make all future payments to CIT and release Dunkin' Donuts from any claims Barkan might have against it.[3] In exchange, Dunkin' Donuts agreed to some modifications of the SDAs and, under Section 4 of the Agreement, promised the following:

> [Dunkin' Donuts] hereby agrees to work with [Barkan] and CIT to attempt to re-finance such existing debt. Specifically, [Dunkin' Donuts] will request that CIT issue a new note for the current balance of the financing, including interest and cure payments, with interest only payments for 18 months, except for reimbursement to [Dunkin' Donuts] for the above cure payments, such reimbursement to be made at the time of refinancing. . . . . [Dunkin' Donuts] makes no representation that CIT will provide such refinancing.[4]

---

[3]The Agreement also required Barkan to execute franchise termination letters for Dunkin' Donuts to hold in escrow. In the event of Barkan's breach, Dunkin' Donuts was authorized to utilize these letters after giving Barkan notice and seven days to cure.

[4]Although it uses the term "refinancing," the Agreement only required Dunkin' Donuts to help restructure Barkan's loans' terms to give him more time to repay the balance and to temporarily limit his monthly obligations to interest-only payments. Dunkin' Donuts did not agree to assist Barkan with anything that would have resulted in Barkan securing additional financing from CIT. Accordingly, in effect Barkan sought merely a debt restructuring, and we will refer to it as such for the remainder of this opinion.

In keeping with this promise, Dunkin' Donuts assigned Betheny Blowers to work with Barkan and CIT. In March 2003, before the Agreement was even finalized, Blowers contacted Laura Sneed at CIT about Barkan's debt restructuring.[5] Blowers learned that the maximum amount of time for which CIT would permit interest-only payments was four months, and that Barkan would need to fill out a "rewrite form" requiring documentation about his credit history and overall finances. Barkan testified that, in April 2004, he faxed the rewrite form to CIT along with fifteen pages of attachments that specified his restructuring request, listed his creditors, estimated his personal net worth, and summarized the financial condition of his operations.

Over the next few months, Blowers continued her efforts to facilitate the restructuring. At Barkan's request, Blowers spoke with Sneed about CIT waiving its refinancing fee and increasing the period of time for which CIT would accept interest-only payments. Blowers also notified Barkan of CIT's request for a business plan and financial statements. In response, Barkan provided Blowers with what he termed a "brief narrative and supporting projections," which Blowers forwarded to CIT.

---

[5]The precise timing and nature of much of the communication between CIT, Blowers, and Barkan is not entirely clear, as Barkan only introduced testimony from himself and Shelly Rush at trial.

Shelly Rush -- the vice president of the portfolio unit at CIT -- was the ultimate decision maker on this particular restructuring request. Prior to her involvement with Barkan's restructuring, she was made aware of his failure to make the monthly payments due to CIT. Rush's deposition testimony, which was read at trial, indicated that she was frustrated with the information, or lack thereof, available to assist with her decisionmaking. This frustration apparently began when she received what she found to be incomprehensible financial documentation about Barkan's operations. Specifically, she was given a two-inch-thick pile of spreadsheets, completely lacking the type of "summary information" -- such as a balance sheet or income statement -- that she typically relied on in analyzing a restructure request. Rush claimed she never saw the seventeen-page rewrite application that Barkan testified he faxed to CIT.

In what was the only conversation Rush would ever have with a Dunkin' Donuts representative pertaining to Barkan's restructuring efforts, Rush and Sneed called Blowers to clarify their confusion about this mass of information. Rush testified that Blowers was "vague" and "not forthcoming" on the phone. In response to Rush's complaint about the lack of clarity in the documentation, Blowers said she could not share any more information. Rush asked if any of Barkan's stores had closed and, after an initially "evasive" response, Blowers told Rush

that Barkan had closed two stores in the prior months.  At that point, Rush expressed disappointment that she had not been notified about these closures,[6] which had significant implications for Barkan's existing debt.[7]  Rush testified that the store closures were "a red flag that there's a lot of activity happening out there that isn't been [sic] defined or shared . . . ."  Toward the end of the phone call, Rush told Blowers that she could not act on the application without better information.[8]  No additional information was ever provided, however, and CIT did not approve the restructuring.

Although Barkan promised in the Agreement to make timely payments to CIT, he failed to do so.  Similarly, Barkan continued to fail to make payments on other debts he owed to Dunkin' Donuts and the DMS Group.  Eventually, in January 2005, Dunkin' Donuts sent Barkan a notice to cure.  In February 2005, Barkan filed for bankruptcy, and eventually his remaining stores were sold for $4.025 million.

---

[6]Barkan testified that he did in fact inform CIT about at least one of these closures.

[7]Rush testified that, under the terms of the Dunkin' Donuts-CIT financing program, "once [a franchisee's] stores are closed, those accounts need to be repurchased by Dunkin' Donuts" and, at that point, "cure payments [are] no longer available."

[8]Rush did not recall Blowers ever expressly requesting that the loan be restructured.

## B. The District Court's Exclusion of the Expert Testimony and Judgment as a Matter of Law

After almost six days of trial, the district court considered the admissibility of the testimony of Barkan's purported expert, Frank Torchio. Barkan's theory of damages was that his inability to restructure his debt prevented him from developing additional stores under the SDAs, and Torchio was prepared to testify about the profits Barkan would have realized from operating those stores. Torchio's proposed testimony was limited to the issue of damages -- he disavowed any opinion as to whether Dunkin' Donuts' conduct prevented Barkan from restructuring or opening new stores. After a hearing outside the presence of the jury, the district court excluded his testimony because Torchio's opinions were (1) based on facts not in the record, and (2) irrelevant in light of the lack of evidence that Barkan would have opened additional stores but for the denial of the debt restructuring.

After Torchio's testimony was excluded, Barkan rested and Dunkin' Donuts moved for a judgment as a matter of law. The district court granted the motion on three grounds: (1) insufficient evidence that Dunkin' Donuts breached the Agreement, (2) "no evidence" that the alleged breach "caused CIT not to restructure the loan[,]" and (3) "no evidence that . . . . [the alleged breach] caused Barkan any loss."

## II. DISCUSSION

This court reviews de novo a district court's decision to grant a judgment as a matter of law. See J.R. v. Gloria, 593 F.3d 73, 78 (1st Cir. 2010).

Judgment as a matter of law is only appropriate if the evidence would preclude a reasonable jury from finding in favor of the non-moving party. See Fed. R. Civ. P. 50(a); Malone, 610 F.3d at 20 (affirming judgment as a matter of law granted under Rule 50(b)); Trigano v. Bain & Co., 380 F.3d 22, 28 (1st Cir. 2004). "If instead fair-minded persons could draw different inferences from the evidence presented at trial, the matter is for the jury[.]" Espada, 312 F.3d at 2 (citing Santiago Hodge v. Parke Davis & Co., 909 F.2d 628, 634 (1st Cir. 1990)). Accordingly, the court "may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." See Richmond Steel, Inc. v. Puerto Rican Am. Ins. Co., 954 F.2d 19, 22 (1st Cir. 1992). A non-moving party with the burden of proof must, however, "present 'more than a mere scintilla' of evidence and may not rely on conjecture or speculation." Katz v. City Metal Co., 87 F.3d 26, 28 (1st Cir. 1996) (quoting Richmond Steel, 954 F.2d at 22).

To succeed on a breach of contract claim under Rhode Island law,[9] a plaintiff must prove that (1) an agreement existed between the parties, (2) the defendant breached the agreement, and (3) the breach caused (4) damages to the plaintiff. Petrarca v. Fid. & Cas. Ins. Co., 884 A.2d 406, 410 (R.I. 2005) (citing Rendine v. Catoia, 158 A. 712, 713 (R.I. 1932)); see Zuromski v. Lukaszek, 20 A.2d 685, 686 (R.I. 1941).

Barkan asserts that Dunkin' Donuts breached its obligations under the Agreement when Blowers failed to request expressly the restructuring, responded to Rush's questions with evasive and unhelpful answers, and failed to act on Rush's request for better information. Barkan argues that this breach caused CIT to refuse his restructuring request, which in turn caused him to lose his opportunity to develop additional stores under the SDAs.

Putting aside whether Dunkin' Donuts breached the Agreement, we turn to the third element of a breach of contract action: causation. To establish causation, the plaintiff must prove that the defendant's breach was the "but for" cause of the alleged damages. See Wells v. Uvex Winter Optical, Inc., 635 A.2d 1188, 1191 (R.I. 1994). Consequently, for Barkan's claim to

---

[9]Neither party disputes that Rhode Island substantive law governs this claim. See LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st Cir. 1998) (substantive state law applies to breach of contract claim brought under diversity jurisdiction (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938))).

-11-

survive a Rule 50(a) motion under his theory of damages, the record must have included some evidence that Barkan would have developed additional stores but for Dunkin' Donuts' breach.  More specifically, Barkan was required to offer support for two causal links: (1) but for Dunkin' Donuts' breach, CIT would have restructured the loans, and (2) but for the lack of debt restructuring, Barkan would have developed the additional stores. Barkan failed, however, to present sufficient evidence of either one, and judgment as a matter of law was therefore appropriate.

### A.   CIT's Debt Restructuring Decision

As to the first link, no reasonable jury could have concluded that CIT would have restructured the debt but for Blowers' purported failures.  To begin with, Rush never suggested that Dunkin' Donuts could have done anything to persuade her to approve the restructuring.  To be sure, Rush testified that she received evasive answers to her questions, informed Blowers that she wanted more concise financial information, and never received the information she sought.  Rush's refusal to move forward with the restructuring request without better information does not, however, prove that she would have agreed to restructure if she had received that information.  In fact, implicit in her quest for a financial summary of Barkan's operations was that Rush would have only agreed to the restructuring if she was comfortable with what she learned from that summary.  Barkan,

-12-

however, presented no evidence that his operations could have withstood such scrutiny.[10]

Not only did Barkan fail to present direct evidence of Rush's willingness to restructure these loans, the trial record was replete with evidence suggesting that Rush would be reluctant to do so.  Specifically, Barkan's operations were rife with financial problems, Barkan had failed to meet his existing obligations to CIT for months, and Barkan had shuttered two stores (a development which raised a "red flag" with Rush).

Although its guarantee of the debt could lead to speculation that a well-orchestrated lobbying effort by Dunkin' Donuts would have resulted in CIT restructuring the loans, nothing in the record actually speaks to how CIT would have reacted to aggressive pressure, or at least better assistance, from Blowers or Dunkin' Donuts.  If anything, the fact that CIT demanded detailed financial information from Barkan, even though the debt was guaranteed, suggests that CIT would not have been particularly susceptible to arm-twisting from Dunkin' Donuts.

---

[10]At oral argument, Barkan asserted that a jury could infer, from his previous success in obtaining loans from CIT and his "forty year[]" history of obtaining financing from other lenders, that CIT would have approved this restructuring but for Dunkin' Donuts' breach.  Barkan's ability to secure financing for projects in the past, however, has little bearing on whether Rush would have approved this particular restructuring request in 2004.

## B.  Barkan's Development of Additional Stores

Although Barkan's failure on the first causal link suffices to affirm the district court's judgment as a matter of law, we nonetheless also find that Barkan failed to present sufficient evidence that Barkan would have successfully opened additional stores but for CIT's refusal to restructure the debt.

By 2004, Barkan's network of stores was plagued by financial difficulty, and Dunkin' Donuts representatives had threatened to block his development of new stores because of what they viewed as substandard conditions at his existing locations. Although Barkan may have taken preliminary steps to develop additional stores throughout Rhode Island, he failed to demonstrate how, given the struggles his franchises faced, the restructuring could have put him in a position to take the next step and actually open the additional stores.  For example, other than the unsubstantiated suggestion that the DMS Group would have continued to finance him, Barkan offered no evidence as to how he would have obtained the significant capital presumably required to open any new location.  As noted by the district court, the restructuring itself would not have infused Barkan with additional money, but would only have temporarily decreased his monthly obligations -- which by 2004 he was not paying anyway. Under these circumstances, a jury could not reasonably conclude

that this particular restructuring would have resulted in any expansion of Barkan's network of stores.

In sum, Barkan failed to provide sufficient evidence of either link required to prove that Dunkin' Donuts' alleged breach caused damages.  It follows that the lack of such causation proof also made the expert evidence as to damages irrelevant and potentially misleading; but, even had it been admitted, the outcome on the Rule 50 motion would have had to be the same.

### III. CONCLUSION

For the foregoing reasons, we <u>affirm</u> the district court's judgment as a matter of law.