# United States Court of Appeals
## For the First Circuit

No. 12-2053

THADDEUS J. JAKOBIEC; EDMUND S. HIBBARD, ESQ.,
Administrator of the Estate of Beatrice Jakobiec;
AUDREY LUM, Co-Trustee of the Lillian Smillie Trust; FREDERICK
JAKOBIEC, M.D., Co-Trustee of the Lillian Smillie Trust,

Plaintiffs, Appellants,

v.

MERRILL LYNCH LIFE INSURANCE CO.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Lynch, Chief Judge,
Thompson, Circuit Judge,
Casper,* District Judge.

Steven M. Latici, with whom Law Office of Steven M. Latici, PA
was on brief, for appellants.
Emily Gray Rice, with whom Christopher G. Aslin and Bernstein,
Shur, Sawyer & Nelson, P.A. were on brief, for appellee.

March 27, 2013

---

*Of the District of Massachusetts, sitting by designation.

**THOMPSON, Circuit Judge.** Thomas Tessier and his brother Michael Tessier allegedly bilked brothers Frederick and Thaddeus Jakobiec and the estate of their mother, Beatrice Jakobiec, out of millions of dollars.[1]  This lawsuit is about only one facet of the Tessiers' overall scheme, their theft of almost $100,000 in life insurance proceeds due to a trust benefitting Thaddeus.  Thaddeus, along with various persons affiliated with the trust and Beatrice's estate, brought this lawsuit not against those who actually stole the money, but against the company that issued the life insurance policy, Merrill Lynch Life Insurance Co. ("Merrill Lynch").  The plaintiffs claim that Merrill Lynch made out the insurance proceeds check to the wrong trust entity, breaching the insurance contract and thereby allowing the Tessiers to steal the money.

The district court jettisoned the lawsuit on summary judgment.  It concluded that even if Merrill Lynch did breach the contract, Merrill Lynch did not cause the plaintiffs' losses because the Tessiers would have stolen the money even if the check had been made out correctly.  We agree with the district court.

## BACKGROUND

### The Life Insurance Policy

We start our story by adding another family member to the mix, Beatrice's sister Lillian Smillie.  In 1986, Smillie executed

---

[1] Since there are multiple Tessiers and multiple Jakobiecs involved in this case, we will refer to these individuals by their first names for ease of reference.

a will. In it, she bequeathed her entire estate, except for furniture and funeral and administrative costs, to a trust (which later received taxpayer identification number 02-6075880) benefitting her nephew Thaddeus (the "Smillie Trust").[2] Thaddeus, who has been blind since birth, depended on his family for support. The will named Thaddeus's brother, Frederick, as trustee of the Smillie Trust. Smillie passed away in 1988.

In 1989, Beatrice applied for the subject life insurance policy with Merrill Lynch. Obviously aware of her sister's trust, Beatrice indicated on the policy application that the policy beneficiaries would be Frederick and the Smillie Trust, with fifty percent going to each. The exact language was: "50% Frederick A. Jakobiec, son, and 50% Frederick A. Jakobiec, Trustee for Thaddeus J. Jakobiec - IRS ID # 02-6075880." The policy then issued at some point, though we do not have a copy of it in the record. Beatrice passed away some years later on May 11, 2001.

## Misplaced Trust

At Beatrice's wake, her son Frederick asked Thomas to administer Beatrice's estate. Thomas probably seemed like a natural choice for the task because not only was he a second cousin to the Jakobiec brothers but he was a licensed attorney that had represented Beatrice in various matters since 1988, including acting as the attorney for the Smillie Trust. But Thomas proved to

---

[2] The will did not give the trust an official title.

-3-

be a wolf in sheep's clothing, and Frederick's decision to enlist his cousin turned out to be a gigantic blunder. You see, Thomas was going through a bit of a rough patch. His law practice was struggling, and he had developed a drinking problem that was getting progressively worse. For Thomas, who admitted that he was nearing the "tail end" of his career but had failed to build a "nest egg" for his retirement, the Jakobiecs became the geese that laid the golden egg.

And so, with the help of his brother Michael, a retired police captain, Thomas engaged in a campaign of forgery and subterfuge to raid the bank accounts of Frederick and Thaddeus and the estate of Beatrice, allegedly stealing over $2 million.[3] Of course, most pertinent for our purposes, is the Tessiers' theft of the life insurance proceeds that had been slated to benefit Thaddeus and so we focus in on this.

### Wheels of Theft Set in Motion

The groundwork for this particular theft was laid when Thomas was rummaging through Beatrice's papers after her death. To add some context, Frederick, according to Thomas, was supposed to

---

[3] After the scheme came to light, Thomas was disbarred and both Tessier brothers were criminally convicted and sent to prison. Allegations that were revealed during Thomas's disbarment included that he had committed multiple forgeries and stole funds from at least twenty different accounts totaling over $1 million. See Order, In the Matter of Thomas J. Tessier, LD-2008-0002 (Dec. 24, 2008), available at http://www.nhattyreg.org/assets/1245192998.pdf. We do not assume the truth of these allegations and they do not factor in our decision, but we describe them for context.

contact him after the wake to further discuss Thomas administering the estate; however, Frederick never did.  In fact, Thomas says that despite diligent efforts on his part to contact Frederick, he never spoke to him again after the wake.  Nonetheless, Thomas decided to go forward with administering the estate and he headed over to Beatrice's house[4] to start going through her papers, including correspondence, bank statements, and the like.  And Thomas ultimately used these financial records to institute probate proceedings for Beatrice's estate in New Hampshire probate court.

Most pertinent for our purposes is the fact that Thomas came across some type of documentation that alerted him to the existence of the Merrill Lynch life insurance policy, though it is unclear exactly what he found.[5]  Once he learned of the policy's existence, Thomas and Michael launched a two-front attack.

First, they wrestled away control of the Smillie Trust from Frederick and this is how they did it.  On June 11, 2002, they filed an ex-parte petition (meaning that Frederick did not participate) with the probate court to remove Frederick as trustee

---

[4] Thaddeus had always lived in this house with Beatrice prior to her death but after she died he moved to a nursing home.

[5] In his deposition, Thomas affirmatively answered yes when asked if he came across the actual life insurance policy.  However, in a letter to Merrill Lynch, Thomas said that the policy was unavailable but that he had the "Investor Account documentation" for the period of April to May 2002.  As for the life insurance application signed by Beatrice, it does not appear that this is what Thomas found because he testified that he never saw that document until his deposition.

and install Michael as successor trustee of the Smillie Trust, alleging that Frederick had been neglecting his brother Thaddeus and failing to pay his bills. The probate court granted the petition and installed Michael as trustee of the Smillie Trust. Second, a few weeks later, Thomas fraudulently created a second trust for Thaddeus, called the "Thaddeus Jakobiec Irrevocable Inter Vivos Trust," later assigned taxpayer identification number 03-6095858 (the "Fraudulent Trust"). Michael was named as both trustee and death beneficiary of this second trust. Thaddeus, whose signature on the document was forged by Michael,[6] was unaware of the Fraudulent Trust's existence. To summarize, by the end of June 2002, there were two trusts for the benefit of Thaddeus: the Smillie Trust, which had been lawfully created in Lillian Smillie's will and which was the rightful beneficiary of the Merrill Lynch policy, and the Fraudulent Trust, which had been unlawfully created by the Tessiers.

**The Tessiers Complete Their Plan**

On or around July 1, 2002, over a year after Beatrice had died, Thomas notified Merrill Lynch of Beatrice's death. Thomas claimed to be representing Thaddeus, whom he assumed was a

---

[6] Michael and Thomas forged both Thaddeus and Frederick's signatures on several other documents not relevant to the theft we are concerned with, including multiple documents giving Thomas power of attorney over Thaddeus and Frederick, a document in which Frederick purportedly disclaimed interest in his mother's estate, and a petition purportedly filed by Thaddeus for Thomas to serve as administrator of Beatrice's estate.

beneficiary of the life insurance policy.  This call led to a series of letters between Thomas and John Greenwood, a claims consultant at Merrill Lynch.[7]  On July 2, Greenwood sent Thomas a letter asking him to fill out certain forms, including a claimant's statement.

Thomas responded on July 15.  He explained that he was enclosing the claimant's statement and trust documentation for "a Testimentary [sic] Trust Under the Estate of Lillian M. Smillie for the Benefit of Thaddeus Jakobiec," and apparently, according to the letter, he enclosed documentation indicating that Michael was trustee for the Smillie Trust, including his probate court certificate of appointment.  However, for some unknown reason,[8] the tax documentation that Thomas enclosed pertained to, and the claimant's statement also referred to, not the Smillie Trust but rather the Fraudulent Trust.[9]

This documentation referring to the Fraudulent Trust (which of course was created in 2002, many years after the life insurance was purchased) confused Greenwood.  He sent Thomas a letter on August 2 seeking to clear things up.  He noted that the

---

[7] All of the correspondence went to and from the office of Thomas's law firm, Christy & Tessier, in Manchester, New Hampshire.

[8] The district court found the discrepancy inexplicable and we too glean no explanation.

[9] Of course, Thomas did not call it the "Fraudulent Trust" in his correspondence with Merrill Lynch, but we continue to use this moniker for ease of reference.

life insurance policy named Frederick as a trustee for Thaddeus and that the trust referenced in the policy was established sometime before 1989 and had a different taxpayer identification number than the one Thomas included documentation for. Greenwood asked: "Could there possibly [be] more than one trust similarly styled?".

Thomas responded on September 16. Yes, he explained, there were two trusts. The Smillie Trust was created in 1988 with number 02-6075880. The trust with number 03-6095858 (the Fraudulent Trust), which Thomas had included documentation for in his July 15 letter, was a "totally separate Trust created in 2002." Thomas went on to ask that the insurance proceeds go to the Smillie Trust. He requested that the amount be made payable to "Michael Tessier, Successor Trustee of the Lillian Smillie Trust for the benefit of Thaddeus Jakobiec" and that the "identification number as indicated should be 02-6075880."

This letter answered some of Greenwood's questions but it raised a new one, which Greenwood brought up in a September 27 letter to Thomas: "Who is Lillian Smillie and how does she relate to our insured, or our insured's Trust?". In an October 21 response, Thomas sought to unravel the mystery. He explained who Smillie was, described the creation of the Smillie Trust, and expounded on how Michael came to replace Frederick as trustee. Thomas indicated that he made a mistake when he listed the Fraudulent Trust's taxpayer identification number on the claimant's

-8-

statement, and that the Fraudulent Trust was "totally separate and distinct from the one that concerns you."  The Smillie Trust, he said, was the correct beneficiary of the life insurance policy. Thomas, who in the letter had referred to the Smillie Trust as both the "Lillian Smillie Trust for the Benefit of Thaddeus Jakobiec" and as the "Thaddeus Jakobiec Trust," concluded by asking Greenwood to make the check "payable to Michael E. Tessier, Successor Trustee Under the Estate of Lillian M. Smillie, for the Benefit of Thaddeus Jakobiec."

On November 18, apparently in response to a request from Greenwood, Thomas sent a copy of the ex parte probate court petition that he had filed to have Frederick removed as trustee of the Smillie Trust.  A short time later, on November 27, 2002, Merrill Lynch finally paid up.  It wrote a check for $98,533.76 ($92,788.50 death benefit plus $5,745.26 interest accruing since Beatrice's death), which represented Thaddeus's half of the life insurance pay-out.[10]  Merrill Lynch made the check payable to "Thaddeus J. Jakobiec Trust C/O 37 Salmon St. Manchester NH 03104" (the address of Thomas's law firm, Christy & Tessier).

---

[10] As the reader will recall, the other half of the death benefit was supposed to go to Frederick.  However, using a forged power of attorney, the Tessiers also got their hands on Frederick's share in June of 2003.  Frederick's half, having accumulated some additional interest, was $100,455.63 and the Tessier brothers split this money evenly.

Within the next week, Michael endorsed the check "Michael Tessier Trustee," and Thomas added the words "of the Thaddeus J. Jakobiec Trust." Michael gave the check to Thomas, who deposited it in his personal bank account on December 4. With the loot secure, Thomas gave his brother a fifty percent cut - $49,266.88 - and Michael deposited this money in his wife's personal account the next day.

### PROCEDURE

Thaddeus filed this lawsuit against Merrill Lynch on June 8, 2010. The original complaint contained two counts: breach of contract and negligence. The complaint alleged that Merrill Lynch breached the life insurance contract by failing to make out the insurance check to the Smillie Trust,[11] and that Merrill Lynch was negligent by failing to exercise due care in identifying the correct beneficiary. After Merrill Lynch filed a motion to

---

[11] The plaintiffs have not been consistent throughout this litigation with regard to what name they say Merrill Lynch should have put on the check. The original complaint said that the check should have been issued to "Michael Tessier, as Successor Trustee of the Lillian Smillie Trust." The amended complaint stated that the proper beneficiary was "the Trust of Lillian Smillie for the benefit of Thaddeus J. Jakobiec," but then stated in the next paragraph that the check should have been made out to "Michael Tessier, as Successor Trustee of the Lillian Smillie Trust." The plaintiffs' brief to this court argues that the outcome may have been different if Merrill Lynch made out the check to "the Trustee of the Smillie Trust." These inconsistencies aside, it is clear that the plaintiffs wanted Merrill Lynch to make payment to the Smillie Trust (as called for in the life insurance application) and so, for simplicity sake, we use the "Smillie Trust" as shorthand for what the plaintiffs say Merrill Lynch should have put on the check.

dismiss,[12] Thaddeus filed an amended complaint. This complaint added as plaintiffs the administrator of Beatrice's estate and the co-trustees of the Smillie Trust, one of whom was Frederick (as one might expect, Thomas and Michael had been booted from those positions in the interim). The negligence count was also removed from the amended complaint and allegations meant to counter a statute of limitations defense were added.

Merrill Lynch filed a motion to dismiss the amended complaint, but the district court felt more factual development was necessary and denied the motion. After discovery, both sides filed cross-motions for summary judgment. The plaintiffs contended it was clear that Merrill Lynch had breached the contract. Of course

---

[12] One of Merrill Lynch's arguments was that the lawsuit was untimely because the supposed wrongful act - its issuance of the check - happened in 2002, more than seven years before the lawsuit was filed. The statute of limitations for most tort claims in New Hampshire is three years but the statute of limitations contains an exception commonly known as the "discovery rule": "when the injury . . . [was] not discovered and could not reasonably have been discovered at the time of the act or omission, the action shall be commenced within 3 years of the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury . . . ." N.H. Rev. Stat. Ann. § 508:4; see Lamprey v. Britton Constr., Inc., 37 A.3d 359, 364-65 (N.H. 2012). Thaddeus argued that the discovery rule should apply because of the Tessiers' extensive fraud and Thomas's exclusive control over Beatrice's personal papers. Thaddeus said he could not have reasonably discovered this cause of action until 2009 when his attorney, who had been hired by Frederick to file a malpractice action against Thomas, received a copy of Merrill Lynch's file and was granted access to Thomas's personal banking records. The district court did not definitively decide the statute of limitations issue, and neither side raises it on appeal, so the issue is not before us.

Merrill Lynch disagreed, but it added that even assuming it had breached the agreement, its breach was not the cause of the plaintiffs' losses.

The district court agreed with Merrill Lynch's lack of causation argument. According to the court, the fatal flaw in the plaintiffs' case was that the Tessiers would have stolen the money even if Merrill Lynch had made the check out to the correct beneficiary, the Smillie Trust, as plaintiffs argued. The district court reasoned, based on the record, that Thomas and Michael had positioned themselves to have complete control over the Smillie Trust, and that they intended to use this power to complete the theft. The district court granted summary judgment to Merrill Lynch and denied plaintiffs' motion for summary judgment. The plaintiffs timely appealed.

## STANDARD OF REVIEW

We review the grant of summary judgment de novo, meaning we give a fresh look to the district court's reasoning. Candelario del Moral v. UBS Fin. Servs. Inc. of P.R., 699 F.3d 93, 99 (1st Cir. 2012). We view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Rared Manchester NH, LLC v. Rite Aid of N.H., Inc., 693 F.3d 48, 52 (1st Cir. 2012). We need not credit "conclusory allegations, improbable inferences, and unsupported speculation." McDonough v. Donahoe, 673 F.3d 41, 46 (1st Cir. 2012) (quoting

-12-

Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008)).  We affirm summary judgment if the moving party can "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case."  Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

## DISCUSSION

Merrill Lynch offers three different reasons to affirm the district court, each of which it says would be independently sufficient.  First, it argues that any breach of contract did not actually cause the plaintiffs' damages (i.e., the rationale of the district court).  Second, it claims that it should not be held liable because the Tessiers' theft was not a foreseeable consequence of any alleged breach.[13]  Third, Merrill Lynch avers

---

[13] Specifically, Merrill Lynch argues that, at the time it entered into the life insurance contract with Beatrice, it could not possibly have anticipated that the trustee of the Smillie Trust (Michael) and the attorney for Beatrice's estate and the Smillie Trust (Thomas) would steal the policy's proceeds.

that it did not breach the contract at all.[14]  Because we agree with Merrill Lynch on the first issue, we need not reach the other two.

### Law of Causation

Even if we assume in the plaintiffs' favor that Merrill Lynch breached the contract[15] by making the check payable to the "Thaddeus J. Jakobiec Trust," that alone would not be enough for the plaintiffs to prevail.  A defendant who breaches a contract is only liable for the damages <u>caused</u> by its breach.  <u>See</u> <u>Robert E. Tardiff, Inc.</u> v. <u>Twin Oaks Realty Trust</u>, 546 A.2d 1062, 1065 (N.H. 1988) (providing that "'one who claims damages [for breach of contract] . . . must, by a preponderance of the evidence, show that the damages he seeks were caused by the alleged wrongful act'" (quoting <u>Grant</u> v. <u>Town of Newton</u>, 370 A.2d 285, 287 (N.H. 1977))).  Further, in the contract arena, New Hampshire courts have

---

[14] The particulars of this argument are as follows.  Merrill Lynch contends that it satisfied its contractual obligations because, regardless of how it made out the check, it delivered the proceeds to Thomas who was attorney for the estate as well as the Smillie Trust.  The check as written, Merrill Lynch continues, was sufficient to enable Michael, the trustee of the Smillie Trust, to apply the funds for the benefit of Thaddeus.  In fact, Merrill Lynch adds, Thomas and Michael were duty bound to apply the proceeds in this manner.

[15] We find it odd that the parties want this court to decide a breach of contract claim but have not provided us with the operative contract (the Merrill Lynch policy) or at the very least stipulated to what it provides.  For instance, it would be helpful to know whether the beneficiary designation in the policy itself mimicked the designation on the policy application or whether there were any other provisions in the policy that could shed some light on what Merrill Lynch's obligations were as far as the manner in which it was required to pay out proceeds.

repeatedly followed the Restatement (Second) of Contracts, see, e.g., Livingston v. 18 Mile Point Drive, Ltd., 972 A.2d 1001, 1006-07 (N.H. 2009) (relying on the Restatement as further support for the trial court's determination); Simpson v. Calivas, 650 A.2d 318, 327 (N.H. 1994) (citing the Restatement as support for the trial court's definition of damages), and so we also look to the Restatement's treatment of causation. It similarly provides that the "injured party is limited to damages based on his actual loss caused by the breach." Restatement (Second) of Contracts § 347 cmt. e. Furthermore, the plaintiff must show that his injury would not have occurred but for the defendant's conduct.[16] See Robert E. Tardiff, Inc., 546 A.2d at 1066 (finding that the defendant, in

---

[16] Here, all the parties and the district court appear to agree that it is proper to assess whether but-for causation exists with respect to a breach of contract action under New Hampshire law. Our review of New Hampshire law, as well as the Restatement (Second) of Contracts, supports this proposition. Other states and circuits have considered this type of causation with respect to breach of contract claims as well. See, e.g., Barkan v. Dunkin' Donuts, Inc., 627 F.3d 34, 40 (1st Cir. 2010) (holding that to succeed on a breach of contract claim under Rhode Island law, the plaintiff must prove that the defendant's breach was the but-for cause of his damages, such that the plaintiff would have developed Dunkin' Donuts stores but for defendant's breach); Citizens Fed. Bank v. United States, 474 F.3d 1314, 1319 (Fed. Cir. 2007) (explaining that requiring an injured party to prove but-for causation in lost profits breach of contract cases is one approach taken by the courts in the Federal Circuit); Point Prods. A.G. v. Sony Music Entm't, Inc., 215 F. Supp. 2d 336, 341 (S.D.N.Y. 2002) (finding that in a breach of contract action, "[p]laintiff cannot recover if it would have suffered the harm regardless of defendant's actions"). Of course we do not know the outer boundaries of how New Hampshire courts would treat this relationship between but-for causation and contract law, and so we limit our analysis to what New Hampshire courts have done thus far.

support of its breach of contract counterclaim, had the burden of proving that its losses "would not have been incurred but for [plaintiff's] delay"); Restatement (Second) of Contracts § 347 cmt. e ("Recovery can be had only for loss that would not have occurred but for the breach."); see also Mahoney v. Town of Canterbury, 834 A.2d 227, 234 (N.H. 2003) (explaining, in a wrongfully issued injunction case, that the prevailing party "may recover expenses that would not have been incurred in the absence of (*i.e.*, but for) the injunction itself").

**Applying the Law to the Facts**

Here we think the district court got it right; based on the undisputed facts on record it is clear the Tessiers would have stolen the money even if Merrill Lynch had made the check out to the so-called correct beneficiary, the Smillie Trust. Plaintiffs have not made the requisite causation showing.

First, it is clear from the record that Thomas was looking to pilfer the insurance proceeds all along. In fact, Thomas admitted in deposition testimony that he intended to steal the money (clearly, a declaration against interest) and circumstantial evidence confirms this. Within a week of getting control of both the Smillie Trust and the Fraudulent Trust, Thomas contacted Merrill Lynch to begin the process of getting the proceeds. Indeed, the next year, Thomas repeated a similar scheme to steal Frederick's half of the insurance proceeds. This time

-16-

line, in the context of the Tessiers' broader scheme to bamboozle the Jakobiecs out of their assets (a sweeping criminal scheme, the existence of which is clear based on the record), makes pellucid that the Tessiers were hell-bent on stealing the insurance money from the get-go. Simply put, this is not a case where a wrongfully made out check fell into the lap of a well-intentioned trustee who was suddenly induced to commit a crime - in fact plaintiffs do not even attempt to make such an argument.

Second, and most significantly, the uncontradicted evidence confirms that the Tessiers had unfettered control of the two trusts that could have potentially received the insurance money. First, with respect to the Smillie Trust, Thomas got Frederick completely out of the picture and installed Michael as trustee. Second, Thomas created the Fraudulent Trust, in which Michael played the dual role of trustee and death beneficiary. Accordingly, when the dust settled, Thomas was in place as the attorney for both the Smillie Trust and the Fraudulent Trust, and Michael was positioned as the trustee for both. The Tessiers effectively controlled the whole swindle A to Z. Therefore if the check had been made out to the Smillie Trust, it too would have been sent to Thomas's firm (since he was the attorney for that trust), Thomas would have called in Michael (since he was the trustee of the Smillie Trust), and Michael as trustee would have

endorsed the check.  So we end up right back in the same place - with the funds deposited in the personal accounts of the Tessiers.

Plaintiffs try to get around this illation by arguing that we do not know what would have happened if the check had been made out correctly; something they say might have tripped up the Tessiers along the way.  Plaintiffs suggest that a rightfully made out check might have tipped off someone in Thomas's law office as to what was happening.  Plaintiffs opine that because the Smillie Trust was an open file in Thomas's office, a check made out to the Smillie Trust might have raised a red flag (they do not say what kind) with someone (they do not say who) in the office.  This theory is pure speculation.  There is no evidence in the record to support it and plaintiffs' counsel admitted as much at oral argument.  There is no deposition testimony from the office staff and no documentation about office procedures.  We do not know if members of Thomas's office staff were in any position to see the check in the first place, or how incoming proceeds were ordinarily directed for processing, or who (if anyone) had the authority to confront Thomas about any discrepancies.  Conclusory allegations and unsupported speculation are insufficient to defeat summary judgment, rather "a measure of factual specificity is required." Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006).  We do not have that specificity here.

-18-

Nor is there any evidence that the Tessiers' scheme could have been picked up by the probate court, as the district court correctly noted. Even though Thomas realized once he started communicating with Greenwood that the Smillie Trust was the proper beneficiary of the life insurance policy, Thomas never reported this fact to the probate court, though he should have since the proceeds were assets of the estate. And because he never told, Thomas never had to account to the probate court to dispose of the proceeds, and so the probate court was never in a position to detect the theft. Any suggestion to the contrary is pure optimistic conjecture.

Also relevant to our causation determination is the fact that Thomas twice specifically asked Greenwood to make the insurance check payable to the Smillie Trust. He obviously thought that was the best way to get his hands on the money. In fact, the October 21 letter directed Greenwood not to make the check out to the Fraudulent Trust, stating: "[t]hat trust is totally separate and distinct from the one that concerns you." Far from thwarting the theft (as the plaintiffs now claim), making the check out to the Smillie Trust would have effectuated Thomas's scheme exactly as he planned it.

The summary judgment stage is "the put up or shut up moment in litigation." Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010) (internal quotation marks omitted).

-19-

Faced with a defendant's motion for summary judgment, a plaintiff must come forward with some evidence showing a genuine dispute of material fact if he wants to get in front of a jury. A plaintiff's failure to produce any evidentiary proof concerning one of the essential elements of his claim is grounds for summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Here plaintiffs cannot establish causation because, as we said, plaintiffs can only recover if their loss would not have happened but for Merrill Lynch's breach. The undisputed facts on record, detailed above, make clear that even if Merrill Lynch had made out the check to the Smillie Trust, as plaintiffs so advocate, the Tessiers still would have taken that check and converted it to their own personal use.

The record presents overwhelming evidence in Merrill Lynch's favor and no persuasive evidence in the plaintiffs' favor on the issue of causation. Unfortunately for plaintiffs, the summary judgment stage is the time when a plaintiff must "affirmatively point to specific facts that demonstrate the existence of an authentic dispute." Kenney v. Floyd, 700 F.3d 604, 608 (1st Cir. 2012) (internal quotation marks omitted). Plaintiffs have not done that here. Because the evidence is so lopsided on the essential element of causation that no reasonable jury could decide for the plaintiffs, Merrill Lynch is entitled to summary

-20-

judgment.  See Collins v. Univ. of N.H., 664 F.3d 8, 20 (1st Cir. 2011).

## CONCLUSION

The Jakobiecs have undoubtedly suffered grave injustices but those injustices were caused by the Tessiers, and not by Merrill Lynch.  Because of the extensive groundwork laid by the Tessiers for their criminal scheme, they could have and would have stolen the insurance money even if Merrill Lynch did exactly what the plaintiffs think it should have done. The district court correctly granted summary judgment to Merrill Lynch, and denied plaintiffs' motion for summary judgment.

**Affirmed.**