# United States Court of Appeals
## For the First Circuit

No. 21-1212

DAVID GULDSETH, MD,

Plaintiff, Appellant,

v.

FAMILY MEDICINE ASSOCIATES LLC; GREGORY BAZYLEWICZ, MD,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Barron, Chief Judge,
Thompson and Howard, Circuit Judges.

Keith L. Sachs, with whom DDSK Law was on brief, for appellant.
Guy P. Tully, with whom Jackson Lewis P.C. was on brief, for appellees.

August 16, 2022

**THOMPSON, Circuit Judge.** Today's case illustrates the reason why the age-old adage "get that in writing" withstands the test of time. Following an employment relationship gone wrong, David Guldseth, MD, brought a seven-count complaint against his former employer, Family Medicine Associates LLC ("FMA"), and one of its members, Gregory Bazylewicz, MD (together with FMA, the "FMA Defendants"). The district court granted the FMA Defendants' motion for summary judgment on all seven counts. On appeal, Dr. Guldseth challenges that ruling on six counts, conceding the futility of one. After careful review, we affirm.

## WHAT LED US HERE

### A Perfect Match

In the spring of 2012, Dr. Guldseth was a licensed physician in Tennessee looking for a new job to relocate his family to either the East Coast or California. A recruiter connected him with FMA located in Manchester, Massachusetts and Dr. Bazylewicz, a physician and FMA partner.[1] Dr. Bazylewicz was in the market for a new doctor to take over his practice, as he hoped to retire in the near future. So Dr. Bazylewicz reached out via email to

---

[1] FMA's operating agreement refers to its owners as "members," but the district court and the briefs use the term "partner" to refer to ownership.

Dr. Guldseth to inquire about his interest in taking over the practice at FMA.

In May, the two doctors spoke over the phone about the opportunity. Dr. Guldseth claims that during this call, very clear promises were made to him by Dr. Bazylewicz about what would be included in the deal. If he joined the practice, Dr. Guldseth would take over Dr. Bazylewicz's practice as well as his partnership interest after eighteen months, Dr. Bazylewicz supposedly said. Dr. Guldseth also claims that Dr. Bazylewicz told him that in addition to the money he would make from seeing patients, his compensation would include income from a lab that FMA owned and the rental income on the office building. Unfortunately for Dr. Guldseth, this conversation was not recorded or transcribed. After these positive conversations and an in-person visit, FMA sent Dr. Guldseth a written offer of employment in July of 2012.

The employment offer from FMA laid out the key terms of Dr. Guldseth's prospective employment -- but (and this is the brass ring) it did not mention partnership at all. A few weeks after receiving the offer document, Dr. Guldseth signed and returned it. FMA then sent Dr. Guldseth a detailed, formal draft employment agreement (the "Employment Agreement") spelling out the terms of the relationship. Dr. Guldseth reviewed the agreement without seeking advice from legal counsel. After assessing the written

proposal, Dr. Guldseth contacted FMA's administrator, Elizabeth Hill, and posed several detailed questions about specific aspects of the agreement. He also requested a few changes to the document, some of which were granted. A revised document with those changes was sent to Dr. Guldseth, and he finalized it with his John Hancock and sent it back to FMA.

The Employment Agreement laid out how Dr. Guldseth would be compensated for his services at FMA. It stipulated that for the first six months of employment, Dr. Guldseth would be paid $10,000 biweekly. For the next twelve months after that, Dr. Guldseth would receive 60 percent of his team's Annualized Net MD Income.[2] Following eighteen months of employment, Dr. Guldseth would be paid 100 percent of that same Annualized Net MD Income. The agreement further stated that either party could terminate the employment relationship without cause with ninety days' written notice. Significant to this dispute, the Employment Agreement contained an integration clause that covered any prior agreements, understandings, and representations, whether oral or written. And much like the employment offer letter, the Employment Agreement made no mention of a partnership interest.

---

[2] Annualized Net MD Income is defined in the agreement as "all income received from services rendered by [Dr. Guldseth's] team less all overhead and expenses attributable to the team." Dr. Guldseth's team is defined as including Dr. Guldseth, "a nurse practitioner, a physician's assistant or any other member of [Dr. Guldseth's] team."

To be sure, there was some pre-agreement-signing chatter in the emails about Dr. Guldseth maybe becoming a partner. In an email to Dr. Guldseth, Dr. Bazylewicz described the position as "a tremendous opportunity to eventually be a partner in the group." In a later email about vacation time, Hill also mentioned that things would be negotiable "once you are a[n] owner." And in another email, Dr. Guldseth asked what the difference was between his eventual compensation as an owner and the 100 percent of Annualized Net MD Income compensation for months eighteen through twenty-four -- though Dr. Guldseth's email seems to suggest that he thought he would become an owner at twenty-four months. Hill's email in response didn't answer the question, but Dr. Guldseth claims that two days later at an in-person meeting, Dr. Bazylewicz and Hill assured him that Dr. Bazylewicz's "practice would transfer" to Dr. Guldseth after eighteen months.

Nonetheless, Dr. Guldseth signed the agreement that contained no such promise of partnership (we repeat, without the advice of counsel). After relocating his family to the Bay State, Dr. Guldseth started working at FMA in October of 2012. With an eye towards retirement, Dr. Bazylewicz continued with the group until some time in late 2012 or early 2013.

### Expectation Versus Reality:  The Breakup

Over time, Dr. Guldseth came to believe he was not being paid what he was due. In May of 2014, Dr. Guldseth contacted Hill

- 5 -

to inquire, chiefly, about when he would obtain Dr. Bazylewicz's partnership interest. That same day, another FMA partner, Dr. Steven Barrett (who had apparently been forwarded the email by Hill), responded to Dr. Guldseth by disputing his characterization of the employment arrangement. It was not his understanding, Dr. Barrett contended, that Dr. Guldseth had ever been offered any partnership interest in FMA. After this exchange, a simmering misunderstanding lingered between Dr. Guldseth and FMA, which eventually came to a head. In June 2014, FMA sent Dr. Guldseth a letter terminating his Employment Agreement effective October 28, 2014 (the end of his two-year term of employment). The letter gave no reason for Dr. Guldseth's termination. Days later, Dr. Guldseth sat down with the partners of FMA and gave them a presentation about the deal he believed he had struck with Dr. Bazylewicz. It didn't change FMA's position.

About a week before his departure from FMA, Dr. Guldseth received a letter from Hill (we'll call it the "Additional Payment Agreement") stating that he would receive his final paycheck on October 28, 2014, and that his accounts receivable for services already performed would be paid out to him within ninety days. But as Dr. Guldseth tells it, he was not paid all the accounts receivable that were due to him. He also asserts that he was not paid the full 60 percent of his team's Annualized Net MD Income for months seven through eighteen.

## This Lawsuit

Nearly three years after he was let go, Dr. Guldseth filed suit against the FMA Defendants alleging breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, unjust enrichment/quantum meruit, promissory estoppel, and nonpayment of wages, and sought an accounting (which is not subject to this appeal).[3]  Eventually, the FMA Defendants filed a motion for summary judgment on all counts, which the district court granted.  Dr. Guldseth appealed, reprising here the arguments he made below.

## OUR LENS

We review the district court's grant of summary judgment de novo.  Brader v. Biogen, 983 F.3d 39, 53 (1st Cir. 2020). Summary judgment should be granted when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law.  Id.; see also Fed. R. Civ. P. 56(a).  When we look at the evidence, all reasonable inferences are drawn in favor of Dr. Guldseth.  Tutor Perini Corp. v. Banc of America Sec. LLC, 842 F.3d 71, 84 (1st Cir. 2016).  But he is not permitted to rely

---

[3] In his brief, Dr. Guldseth does not break out how each claim specifically ties to each of the defendants, and in particular, does not explain what contracts were entered into specifically by Dr. Bazylewicz and how he personally breached them.  Because he does not make these separate arguments on appeal, we deem them waived.  Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175 (1st Cir. 2011).

on "conclusory allegations, improbable inferences, and unsupported speculation." Theidon v. Harvard Univ., 948 F.3d 477, 496 (1st Cir. 2020) (quoting Coll v. PB Diagnostic Sys., 50 F.3d 1115, 1121 (1st Cir. 1995)). As we've said before, summary judgment is "the put up or shut up moment in litigation." Jakobiec v. Merrill Lynch Life Ins. Co., 711 F.3d 217, 226 (1st Cir. 2013) (quoting Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010)). If the moving party meets their initial burden of showing there's no genuine factual issue for trial, the non-moving party must come armed with some evidence to show that a reasonable jury could find for them, id., lest their claims get caught in the summary-judgment scythe, Theidon, 948 F.3d at 494.

## OUR TAKE

### Breach of Contract

Dr. Guldseth first claims that he entered into three separate contracts with FMA, all three of which FMA breached. The first agreement he alleges was breached is the "Partnership Transfer Agreement." That agreement isn't your typical ink-on-paper contract, but rather an oral one: He says Dr. Bazylewicz agreed to transfer his partnership interest if Dr. Guldseth agreed to work at FMA for eighteen months. The second agreement is the written one, the Employment Agreement, which set out the terms of Dr. Guldseth's employment. Dr. Guldseth says this agreement was breached when FMA failed to pay him 60 percent of his team's

- 8 -

Annualized Net MD Income during months seven through eighteen of his employment. Finally, he argues that the FMA Defendants breached the "Additional Payment Agreement" -- where he was told in a letter that he would be paid for the accounts receivable for services performed by his team prior to his 2014 departure within ninety days (less a 6-percent collection fee).

As we take a look at each of those agreements, we keep in mind that to make out a breach-of-contract claim, Dr. Guldseth must show that (1) there was an agreement between him and FMA, (2) he was "ready, willing, and able" to perform his end of the contract, (3) FMA committed a breach of the contract, and (4) he suffered harm as a result. See River Farm Realty Tr. v. Farm Fam. Cas. Ins. Co., 943 F.3d 27, 41 (1st Cir. 2019); Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 39 (Mass. 2016).

### The Partnership Transfer Agreement

Dr. Guldseth says the FMA Defendants breached the Partnership Transfer Agreement by not coughing up the partnership interest he was owed. According to Dr. Guldseth, the deal was that he would work for FMA for eighteen months and, for months seven through eighteen, he would take just 60 percent of his team's Annualized Net MD Income. That twelve-month stint at a reduced rate, he says, was his buy-out of Dr. Bazylewicz's piece of the practice, which the FMA Defendants had to hand over at the end of the eighteen-month period. Though the district court noted that

"a factfinder could find that Drs. Guldseth and Bazylewicz formed an oral contract," it nonetheless found that Dr. Guldseth's breach-of-contract claim failed because the Employment Agreement, through its integration clause, superseded the Partnership Transfer Agreement.[4]

Whether the Partnership Transfer Agreement survived the subsequent signing of the Employment Agreement depends on whether the Employment Agreement was a complete integration of the parties' agreement regarding Dr. Guldseth's employment. See Chambers v. Gold Medal Bakery, Inc., 982 N.E.2d 1190, 1196 (Mass. App. Ct. 2013). By fully integrated, we mean "a statement which the parties have adopted as a complete and exclusive expression of their agreement." Id. (quoting Starr v. Fordham, 648 N.E.2d 1261, 1268 n.8 (Mass. 1995)). Compare that to an only partially integrated agreement, which means the agreement "is intended as a final expression of one or more terms, but not as the complete and exclusive expression of all terms to which the parties agreed." Id. The degree of integration in turn dictates the degree to which earlier agreements are discharged by the later-formed agreement. See id. Whether an agreement is fully integrated is, under Massachusetts law, an issue of fact. Realty Fin. Holdings, LLC v.

---

[4] The integration clause stated that the Employment Agreement "supersede[d] any and all prior agreements, understandings and representations, whether oral or written."

KS Shiraz Manager, LLC, 18 N.E.3d 350, 355 (Mass. App. Ct. 2014). So when there is a genuine dispute of material fact concerning the integration of the agreement, summary judgment cannot be granted. See Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 87 (1st Cir. 2018) (courts resolving summary-judgment motions cannot resolve disputes of fact but rather must leave those to the trier of fact); see also Green v. Harvard Vanguard Med. Assocs., Inc., 944 N.E.2d 184, 192 (Mass. App. Ct. 2011) (stating as much concerning an integrated agreement under Massachusetts' summary-judgment standard).

A contract's integration clause (sometimes also called a zipper clause or merger clause) is a good hint that the parties intended it to be fully integrated -- but Massachusetts courts have consistently said that integration clauses are "not dispositive." Realty Fin. Holdings, 18 N.E.3d at 355; see Chambers, 982 N.E.2d at 1196; Green, 944 N.E.2d at 191 ("[E]ven apparently straightforward contractual language asserting integration will not always compel a conclusion that a writing reflects a complete and integrated agreement."). The integration clause could bear less weight when, for example, the agreement is boilerplate or the parties were mismatched in negotiating power. Realty Fin. Holdings, 18 N.E.3d at 356 (collecting cases). And it's possible an integration clause may not "discharge[] a prior

agreement on an entirely unrelated topic." Chambers, 982 N.E.2d at 1197.

Yet here, the Partnership Transfer Agreement and Employment Agreement did cover the same topic. According to Dr. Guldseth, the gist of the Partnership Transfer Agreement was that if he came to work at FMA for eighteen months, then he'd get Dr. Bazylewicz's chunk of the practice. But the Employment Agreement specifically covered the terms and compensation of Dr. Guldseth's employment at FMA -- and even went so far as to cover the terms of employment (not partnership) and compensation for six months after his claimed eighteen-month milestone. Nowhere in that agreement did it mention any transfer of a partnership interest, whether after eighteen months or some other period. The Employment Agreement also stipulated that Dr. Guldseth agreed to accept the compensation figures in the agreement "as full compensation for services rendered pursuant to this Employment Agreement." Not to mention the fact that the agreement expressly provided that Dr. Guldseth's "employment" -- again, not partnership -- "w[ould] automatically be renewed for successive one year terms . . . until terminated in accordance with th[e Employment] Agreement." And it gave either party the option to terminate the agreement on ninety days' notice, without cause, leaving Dr. Guldseth to collect only the compensation owed to him under the Employment Agreement when the two parted ways. See Realty Fin. Holdings, 18 N.E.3d at 356

- 12 -

(finding an agreement integrated where the final agreement "specifically addressed" the topic later litigated).

The history of the negotiations here further reveals that the Employment Agreement was (as it said it was) integrated. The agreement was neither brief nor boilerplate. See Antonellis v. Northgate Constr. Corp., 291 N.E.2d 626, 628 (Mass. 1973) (brevity of the agreement suggested non-integration); Wang Labs., Inc. v. Docktor Pet Ctrs., Inc., 422 N.E.2d 805, 808 (Mass. App. Ct. 1981) (standard form contracts may not readily allow for the insertion of special agreements, which "may have significance" to the integration question). And it was drawn up and negotiated at arm's length between two sophisticated parties. See Chambers, 982 N.E.2d at 1197 (when contracts are "negotiated at arm's length between sophisticated parties," it helps give the integration clause more force); see also Realty Fin. Holdings, 18 N.E.3d at 357 (unequal bargaining power and sophistication might give the integration clause less force); Green, 944 N.E.2d at 187-88, 192 (finding material issue of fact as to integration in agreement between medical secretary with an associate's degree and his employer).[5] Dr. Guldseth is well educated (holding a doctorate).

_____

[5] Dr. Guldseth faults the district court for "inventing a new standard" of the "sophisticated individual." But nothing the district court said broke new ground -- it came directly from precedent from the Massachusetts Appeals Court. See Chambers, 982 N.E.2d at 1197.

- 13 -

Throughout the negotiation process, Dr. Guldseth carefully reviewed the Employment Agreement (albeit without a lawyer) and asked questions, demonstrating he was a sophisticated individual and "evidenc[ing] a capacity to review the contract cautiously and with an eye towards protecting his interests."  Cf. Turner v. Johnson & Johnson, 809 F.2d 90, 97 (1st Cir. 1986) (where a contract is "fully negotiated and voluntarily signed," a plaintiff cannot introduce evidence of a prior oral agreement "inconsistent with a contract provision that specifically addressed the particular point at issue").

The district court did not err in finding that the Employment Agreement's integration clause superseded the prior oral Partnership Transfer Agreement.[6]  And Dr. Guldseth makes no argument on appeal that he has a viable claim against Dr. Bazylewicz individually for breach of any agreement to transfer his partnership interest to Dr. Guldseth.  So any breach-of-contract claim on that agreement fails.

---

[6] Had the contract contained an ambiguity, the integration clause, as Dr. Guldseth suggests, would not bar the introduction of extrinsic evidence to explain the meaning of the ambiguous contract terms.  See Kobayashi v. Orion Ventures, Inc., 678 N.E.2d 180, 184 (Mass. App. Ct. 1997).  But Dr. Guldseth does not point to any provision of the contract he deems ambiguous, and in our de novo review, we see none.  See Weiss v. DHL Exp., Inc., 718 F.3d 39, 44 (1st Cir. 2013) ("Interpretation of a contract is ordinarily a question of law for the court.").

***The Employment Agreement and Additional Payment Agreement***

Next, Dr. Guldseth argues that the Employment Agreement and Additional Payment Agreement (which is a reference to an October 20, 2014 letter regarding his remaining payments prior to termination) were breached by failing to pay him "the amounts owed" under both agreements.

Problem is that to show a breach of contract, Dr. Guldseth had to show (among other things) that there was a breach by FMA -- that it didn't do something it agreed to. See River Farm Realty Tr., 943 F.3d at 41. Yet aside from his conclusory deposition testimony, Dr. Guldseth presented no evidence below that FMA didn't pay him what he was owed (his claimed breach).[7] See Brader, 983 F.3d at 53 (to defeat a motion for summary judgment, a "nonmovant cannot rely on conclusory allegations, improbable inferences, and unsupported speculation" (internal quotation omitted)).

Deflecting his lack of evidentiary support, Dr. Guldseth points the finger at FMA for withholding "critical documents during discovery." But that argument has no teeth. What the record makes clear is that Dr. Guldseth served overbroad discovery requests,

---

[7] Dr. Guldseth thought that because revenue in 2012 was higher than the numbers Dr. Bazylewicz gave him for the 2011 revenue, that meant his income should've been correspondingly higher. But as the district court identified, Dr. Guldseth's compensation was based on revenue minus expenses, not just revenue. And Dr. Guldseth produced no evidence regarding expenses.

the FMA Defendants objected, and he did not make any effort to narrow his requests or meet and confer with the FMA Defendants to obtain information he says he needed to prove his claims, nor did he a file a motion to compel.[8] Dr. Guldseth cannot get his evidentiary arrears in the green by blaming others -- he failed to appropriately request the discovery materials he needed to survive the summary-judgment scythe and faced the consequences.

**Breach of the Implied Covenant of Good Faith & Fair Dealing**

Dr. Guldseth's next claim is that the FMA Defendants breached the implied covenant of good faith and fair dealing in each of the three agreements.

That covenant of good faith and fair dealing between the parties is implied in all agreements under the Commonwealth's laws. Harrison v. NetCentric Corp., 744 N.E.2d 622, 629 (Mass. 2001). The covenant provides "that neither party shall do anything [that] will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Druker v. Roland Wm. Jutras Assocs., 348 N.E.2d 763, 765 (Mass. 1976)

---

[8] Nor did he move, as he could have, under Rule 56(d) for an order giving him some time to get the records he needed after the FMA Defendants filed their summary-judgment motion. See Fed. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.").

- 16 -

(quoting Uproar Co. v. Nat'l Broadcasting Co., 81 F.2d 373, 377 (1st Cir. 1936)). The aim "is to ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract, and that, when performing the obligations of the contract, the parties remain faithful to the intended and agreed expectations of the contract." Eigerman v. Putnam Invs., Inc., 877 N.E.2d 1258, 1264 (Mass. 2007) (internal citation omitted) (quoting Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004)). To show a breach of the implied covenant, one party has to show that the other violated her "reasonable expectations . . . concerning the obligations of the contract." 477 Harrison Ave., LLC v. JACE Bos., LLC, 134 N.E.3d 91, 101 (Mass. 2019).

Because the implied covenant is all about the expectations concerning the obligations actually in the contract, the scope of the covenant is only as broad as the contract that governs the particular relationship. Eigerman, 877 N.E.2d at 1264. The covenant does not supply terms that the parties were free to negotiate but failed to include. Id. Nor does it create rights and duties not otherwise provided for in the contract. Id. In other words, the covenant cannot create rights and duties that are not already present in the existing contractual relationship. Id. at 1265. And as a result, the covenant governs only conduct of parties that have actually entered into a contract -- without a

contract, there is no covenant to be breached.  Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 230 (1st Cir. 2005).

With all that in mind, we can make quick work of Dr. Guldseth's implied-covenant claims.

First, there can be no breach of the implied covenant in the Partnership Transfer Agreement because it was superseded by the Employment Agreement.  See id. (no contract, no implied covenant to be breached).[9]

Second, although not a beacon of clarity, we understand Dr. Guldseth's brief to claim that the implied covenants in the Employment Agreement and the Additional Payment Agreement were breached when the FMA Defendants didn't reimburse him all the greenbacks he was owed for his services.  But as we've already discussed, since Dr. Guldseth (through his own fault) came empty-handed of evidence supporting that allegation by the time the put-up-or-shut-up moment of summary judgment came, his claim couldn't survive.  See Jakobiec, 711 F.3d at 226.

And third, to the extent Dr. Guldseth claims the Employment Agreement's implied covenant was breached because the

_____

[9] Dr. Guldseth develops no argument as to how a jury could find that the covenant of good faith and fair dealing in the Partnership Transfer Agreement was breached prior to the integration of his agreements with FMA through his signing of the Employment Agreement.

- 18 -

FMA Defendants didn't make him a partner, that claim fails, too. The implied covenant isn't a prophylactic for contractor's remorse -- the covenant doesn't inject terms the parties could've included but chose not to. <u>Eigerman</u>, 877 N.E.2d at 1264. And the Employment Agreement says nothing about any transfer of a partnership interest to Dr. Guldseth after eighteen months' employment. Indeed, it explicitly gives FMA the option to terminate Dr. Guldseth's employment without cause at any point in the first twenty-four months of the relationship, which it did. <u>See</u> <u>id.</u> at 1264–65 (a plaintiff cannot reasonably understand or expect the obligations to be contrary to what the contract provides).

### Fraud

Chugging along, Dr. Guldseth believes he was defrauded because he received assurances from Dr. Bazylewicz that the practice would be transferred after eighteen months (which never happened), he was paid less than he was entitled, and -- to add insult to injury -- he was fired. He also claims that Dr. Bazylewicz told him that his compensation would include a share of the rental income, which turned out not to be the case. He contends that the district court erroneously relied on the integration

- 19 -

clause and ignored these representations "even though there was fraud in the inducement."[10]

To establish a claim of common-law fraud (the claim made in his complaint), Dr. Guldseth must show (1) a false representation by FMA, (2) that is related to a matter of material fact, (3) that FMA knew was false, (4) that FMA made this representation with the purpose of inducing action by Dr. Guldseth, and (5) that Dr. Guldseth relied on this false representation as true and acted upon it to his detriment. See Balles v. Babcock Power Inc., 70 N.E.3d 905, 913 (Mass. 2017). As the SJC has made clear, "[a]n integration clause in a contract does not insulate automatically a party from liability where he induced another person to enter into a contract by misrepresentation." Starr, 648 N.E.2d at 1268. But it's also added (quoting us) that "if the contract was fully negotiated and voluntarily signed, plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue." Id. (cleaned up) (quoting Turner, 809 F.2d at 97). Any reliance on an understanding inconsistent with the written terms of the agreement is unreasonable as a matter of law. See Masingill v. EMC Corp., 870 N.E.2d 81, 89 (Mass. 2007)

---

[10] The complaint does not make any allegation of fraud in the inducement -- only common-law fraud, which is what Dr. Guldseth's brief on appeal focuses on.

(calling this "a rule of long standing"); HSBC Realty Credit Corp. (USA) v. O'Neill, 745 F.3d 564, 571 (1st Cir. 2014). Put differently, a written agreement made from an arm's-length deal can't be undone just because one party later claims she thought the deal was something other than what the signed contract reduced to ink. McCartin v. Westlake, 630 N.E.2d 283, 289 (Mass. App. Ct. 1994). Courts and juries won't "rewrite a fully negotiated contractual agreement that so precisely sets out the rights and obligations of two sophisticated parties." HSBC Realty, 745 F.3d at 572 (quoting Turner, 809 F.2d at 97). Instead, as we've cautioned before, "a knowledgeable buyer should not sign a contract that conflicts with his or her understanding of the agreement." Turner, 809 F.2d at 97-98.

Dr. Guldseth would have done well to heed that warning here, and his decision not to do so dooms his fraud claims. Dr. Guldseth may well have been promised a share of the partnership after eighteen months' labor at FMA. But the Employment Agreement, which superseded the Partnership Transfer Agreement, should've alerted him that something was off here. As we've detailed already, the Employment Agreement provided that Dr. Guldseth's initial term of employment (not partnership) ran for twenty-four months -- making nose-to-face plain that Dr. Guldseth would still

be an employee, not a partner, after eighteen months' employment.[11] If that's not enough, the Employment Agreement permitted Dr. Guldseth to be terminated at any point in the first two years, and it laid out in detail the compensation he would receive over that period. Which all flies right in the face of Dr. Guldseth's expectation that he would've gotten the partnership nod at eighteen months -- meaning he couldn't reasonably rely on any representations to the contrary. See Masingill, 870 N.E.2d at 89.[12]

His fraud claim based on the supposedly missing revenue streams in his compensation calculations suffers a similar fate. Dr. Guldseth claims that Dr. Bazylewicz and Hill told him that the revenue used to calculate his compensation after month six of employment included certain rental incomes. But the Employment Agreement makes clear that the relevant revenue included only money

_____

[11] The email exchanges further reflect that Dr. Guldseth understood the Employment Agreement's timeline. He sent an email during the contract negotiations to Hill asking her what the difference was between the compensation for months eighteen through twenty-four listed in the contract and what he would get when he "bec[a]m[e] an owner at 24 months." That question came in response to an email from Hill giving him his proposed schedule, which would be effective "until [he] bec[a]me an owner in 2 years."

[12] To be clear, we need not (and do not) decide whether Dr. Guldseth could have reasonably relied on a promise of receiving a partnership share at some point in the future. We decide only that he could not have reasonably relied on the promise he claims here -- that he would become a partner after eighteen months' employment with FMA.

- 22 -

"collected by FMA that is attributed to professional services rendered by the Doctor, a nurse practitioner, a physician's assistant or any other member of the Doctor's team" -- not any real-estate income. So he could not reasonably rely on any representations to the contrary.

## Promissory Estoppel

For the same reason his fraud claim on the transfer of the partnership fails, Dr. Guldseth's promissory-estoppel claim fails, too. As with the fraud claim, Dr. Guldseth has to show (among other things) that his reliance on the promise of Dr. Bazylewicz's partnership share after eighteen months' work was reasonable. See Sullivan v. Chief Justice for Admin. & Mgmt. of the Trial Ct., 858 N.E.2d 699, 711-12 (Mass. 2006) (listing the three elements of a promissory-estoppel claim and noting the plaintiff has a "heavy burden" in showing them). But that he cannot do. The Employment Agreement details Dr. Guldseth's compensation for his work at FMA, stipulates that he will accept that compensation as his sole compensation for work performed, provides that he could be terminated for any reason before twenty-four months' employment, expressly says the employment (not partnership) would be renewed after that twenty-four-month period, and tells him not to rely on prior oral representations. The written Employment Agreement explicitly conflicted with the idea that he'd be a partner at eighteen months -- and "[e]xplicit

- 23 -

conflict engenders doubt," which causes a reasonable person to investigate further, not to "gamble with the law of the excluded middle." Trifiro v. N.Y. Life Ins. Co., 845 F.2d 30, 33-34 (1st Cir. 1988); see Coll, 50 F.3d at 1124 (an employee cannot reasonably rely on a pre-employment oral promise where the later-inked employment agreement was at odds with that promise, and thus no promissory-estoppel claim lies).

## Unjust Enrichment/Quantum Meruit

Moving along, Dr. Guldseth urges that the district court was wrong on his unjust-enrichment (a/k/a quantum meruit) claim[13] where it found that the Employment Agreement foreclosed his claims. He flags all his testimony about the representations Dr. Bazylewicz and Hill made about his partnership plan. Without rehashing the past, we'll cut to the chase and say we agree that summary judgment was appropriate on this claim.

To establish a claim for quantum meruit or unjust enrichment, Dr. Guldseth is required to demonstrate: (1) that he "conferred a measurable benefit upon" the FMA Defendants; (2) that he "reasonably expected compensation from" them; and (3) that the FMA Defendants "accepted the benefit with the knowledge, actual or chargeable, of [his] reasonable expectation." Finard & Co., LLC

_____

[13] These are two ways of describing the same theory of recovery, as we've said before. Santangelo v. N.Y. Life Ins. Co., 785 F.3d 65, 73 (1st Cir. 2015).

v. <u>Sitt Asset Mgmt.</u>, 945 N.E.2d 404, 407-08 (Mass. App. Ct. 2011). Whether or not receipt of a benefit is unjust turns on the reasonable expectations of the parties. <u>Metro Life Ins. Co.</u> v. <u>Cotter</u>, 984 N.E.2d 835, 850 (Mass. 2013).

But here's the thing: A plaintiff is not entitled to recovery on an unjust-enrichment or quantum-meruit theory where there is a valid contract that covers the same subject matter and defines the obligations of the parties. <u>Bos. Med. Ctr. Corp.</u> v. <u>Sec'y of Exec. Off. of Health & Hum. Servs.</u>, 974 N.E.2d 1114, 1132 (Mass. 2012) (citing <u>York</u> v. <u>Zurich Scudder Invs., Inc.</u>, 849 N.E.2d 892, 901 (Mass. App. Ct. 2006)); <u>Zarum</u> v. <u>Brass Mill Materials Corp.</u>, 134 N.E.2d 141, 143 (Mass. 1956); <u>see also</u> <u>Cotter</u>, 984 N.E.2d at 849 (noting that there could be a claim where one party to the contract demands performance not due under the contract). Instead, "[a] valid contract defines the obligations of the parties as to the matters within its scope, displacing to that extent any inquiry into unjust enrichment." Restatement (Third) of Restitution and Unjust Enrichment § 2 (2011); <u>see</u> <u>Shaulis</u> v. <u>Nordstrom, Inc.</u>, 865 F.3d 1, 16 (1st Cir. 2017) ("Massachusetts law does not permit litigants to override an express contract by arguing unjust enrichment." (cleaned up)).

On appeal, Dr. Guldseth regurgitates his prior argument that the Employment Agreement was breached by not completing transfer of the practice to him, thereby leading to him working

- 25 -

for less than he expected. Yet the Employment Agreement clearly delineated the obligations of Dr. Guldseth (that he'd work at FMA) and the FMA Defendants (that FMA would pay him as specified in the contract). So we agree with the district court that because the Employment Agreement (which was comprehensive, carefully drafted, and thoroughly negotiated) was clear on its face as to the obligations of each party -- which did not include any agreement to transfer any piece of the FMA partnership to Dr. Guldseth after eighteen months' work -- there can be no quantum-meruit or unjust-enrichment claim. See Zarum, 134 N.E.2d at 143 (no quantum-meruit claim where a "carefully drawn" agreement "specifically cover[ing] the subject matter" at issue didn't include the relief sought by the plaintiff); York, 849 N.E.2d at 901 (no quantum-meruit claim where there was an agreement governing the plaintiff's employment).

## Non-Payment of Wages

Finally, Dr. Guldseth asserts a claim under the Massachusetts Wage Act for underpaid wages. See Mass. Gen. Laws ch. 149, § 148. He premises that claim (as he puts it) "on the same set of operative facts as his claim of breach of the Employment Agreement and Additional Payment Agreement." And he again complains that the FMA Defendants did not give him all of the relevant legal records he needed to prove his claim. For the same reasons that we affirmed summary judgment as to the contract

claims based on the underpaid wages, we affirm summary judgment on this claim, too. Dr. Guldseth simply did not produce record evidence (aside from his unsupported speculation) that he was underpaid, and doing so was his burden to carry. See Ellicott v. Am. Cap. Energy, Inc., 906 F.3d 164, 169 (1st Cir. 2018).

## ZIPPING THINGS UP

For all these reasons, the judgment is **affirmed**. The parties shall bear their own costs.