# United States Court of Appeals
## For the First Circuit

No. 22-1074

PETER GOTTLIEB, individually and on
behalf of all persons similarly situated,

Plaintiff, Appellant,

v.

AMICA MUTUAL INSURANCE COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Kayatta, Lipez, and Thompson,
Circuit Judges.

John Peter Zavez, with whom Noah Rosmarin, Brendan M.
Bridgeland, and Adkins, Kelston & Zavez, P.C., were on brief, for
appellant.
Christopher Michael Reilly, with whom Laura Meyer Gregory,
Anthony Antonellis, and Sloane and Walsh, LLP, were on brief, for
appellee.

December 30, 2022

**KAYATTA**, **Circuit Judge**.  Peter Gottlieb claims that the price he agreed to pay Amica Mutual Insurance Company to insure his home was $16 too high because it was based on an excessive coverage limit.  Claiming as well that other Amica insureds paid too much to insure their homes, he filed this putative class action.  After the district court dismissed part of Gottlieb's complaint for failure to state a claim and entered summary judgment disposing of the remainder of his claims, he filed this appeal.  For the following reasons, we affirm the judgments of the district court.

## I.

Gottlieb owns a home in Burlington, Massachusetts.  In 2015, he purchased a homeowners insurance policy from Amica that covered him from March 10, 2015, through March 10, 2016.  The coverage limit for replacing his house in the event of a loss was $311,000, for which Gottlieb paid a $730 premium.  The policy also contained an endorsement providing additional coverage of up to 130% of the coverage limit if Gottlieb agreed to certain conditions, including that Amica could adjust the coverage limit and the premium "in accordance with" "property evaluations [Amica] make[s]" and "[a]ny increases in inflation."  The policy contained no other language allowing Amica to increase coverage limits.

No loss occurred during the one-year term of the policy.  With the expiration of the policy term approaching, Amica sent

Gottlieb a proposed renewal policy, which contained the same endorsement, along with a cover letter. The proposed premium for the renewal policy was $795 ($65 more than the premium for the original policy). Sixteen dollars of the increase was due to a higher coverage limit for Gottlieb's house ($321,000 versus $311,000). Amica arrived at that coverage limit based on a multiplier calculated by a company called E2Value, Inc., which projected costs for Gottlieb's zip code based on various data sources. The rest of the increase in the premium was due to changes in the base rate and other changes in Amica's public rate filing.

The cover letter accompanying the renewal pointed out that the increased coverage limit was partially attributable to higher reconstruction costs, which it stated had "risen steadily since [Amica's] last survey of [Gottlieb's] home," along with "various other factors . . . that impact the dwelling amount." The letter noted that Gottlieb was ultimately responsible for determining the proper dwelling limit for his home. After calling Amica to clarify how much coverage he would get under the endorsement, Gottlieb accepted the 2016-2017 renewal policy, and Amica issued the policy.

Gottlieb then sued Amica, claiming that the increased coverage limit on his house and premium in the 2016-17 violated the terms of his contract with Amica. Gottlieb argues that the

endorsement in his original policy limited how Amica could set the coverage limit in the renewal policy; namely, Amica could change the original limit only if it did a new home inspection, or accounted for an increase in inflation. Because Amica did not reinspect Gottlieb's home and because his coverage limit allegedly increased more than the rate of inflation, Gottlieb contends that Amica breached the policy.

Gottlieb also argues that even if Amica did not explicitly breach the policy, it breached the implied covenant of good faith and fair dealing. In his view, Amica acted in bad faith by adjusting his coverage limit based on impermissible factors (including projected future inflation and reconstruction costs), attempting to rewrite the contract, and deceiving him about why the limit was increasing. As to the claimed deception, Gottlieb contends that Amica lied to him by stating in the cover letter that one reason for the proposed increase in his dwelling limit was a rise in reconstruction costs. According to Gottlieb, those costs had not increased, or at least not as much as reflected in the proposed increase to Gottlieb's coverage; thus, Gottlieb contends Amica's statement was untrue and deceptive. As a result of this allegedly fraudulent adjustment to his coverage limit, Gottlieb asserts that Amica sold him illusory coverage he could never use, because Amica would never pay more than actual replacement costs and his replacement costs would always be less

than Amica's estimate. Because Amica received the benefit of Gottlieb's additional premium but provided no additional practical benefit to Gottlieb, he argues, he is also entitled to relief for unjust enrichment, money had and received, and violation of Massachusetts law prohibiting deceptive business practices, Mass. Gen. L. c. 93A ("Chapter 93A").

Gottlieb filed his complaint in Middlesex Superior Court. Amica then removed the case to the United States District Court for the District of Massachusetts. The district court dismissed the breach of contract and implied covenant of good faith and fair dealing claims. The court found that the 2015-16 and 2016-17 policies were two separate contracts, so setting the initial coverage limit in the latter could not have violated the former. Moreover, the initial contract imposed no restrictions on how the new coverage limit in the renewal contract could be set. Likewise, the court ruled, no covenant of good faith and fair dealing extended or created a freestanding obligation to use the within-term rules contained in the first policy for selecting the starting point of the renewal policy. Following discovery and an amendment to the complaint, the district court granted summary judgment for Amica on the unjust enrichment, money had and received, and Chapter 93A claims. The court found that the equitable claims were unavailable because there was an adequate remedy at law and a valid contract. It also concluded that there

was no Chapter 93A violation because although Gottlieb had been charged a higher premium, he had received the benefit of additional coverage.  Gottlieb appeals from both the denial of the motion to dismiss and the grant of summary judgment for Amica.

## II.

We review a district court's grant of a motion to dismiss de novo.  Legal Sea Foods, LLC v. Strathmore Ins. Co., 36 F.4th 29, 34 (1st Cir. 2022).  In doing so, we take all of Gottlieb's well-pled allegations as true and view the facts in the light most favorable to him.  Id.  We affirm if, having done so, the complaint does not provide "enough factual detail to make the asserted claim plausible on its face."  Id. at 33 (internal quotation marks omitted) (quoting Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015)).  We also review a district court's grant of summary judgment de novo, drawing all inferences in favor of Gottlieb.  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).  Following the lead of both parties, we apply Massachusetts law.

## A.

Gottlieb's breach of contract claim begins with the original policy's limitation on Amica's unilateral ability to change the coverage limit of $311,000 and the corresponding premium upon which the parties had agreed when they entered the contract.  Such a limitation makes sense:  A homeowner who agrees to receive

one year of coverage for a set premium hardly expects that, during that year, the insurer could jack up the premium for that year's coverage beyond that to which the homeowner agreed by declaring a unilateral increase in the coverage limit.

Amica, though, did no such thing. After agreeing to issue the original policy with a one-year term, Amica provided a full year of coverage for the agreed-upon premium without making any adjustments that would increase the premium (even those that would have been allowed under the policy endorsement). Had the parties gone their separate ways upon expiration of the policy, it is clear that no breach could have been claimed.

The parties did not go their separate ways. Instead, they entered into a new policy -- the renewal policy. In so doing, they agreed upon a new, slightly higher coverage limit of $321,000 (as compared to $311,000 in the prior year) and a corresponding premium of $795. During the term of that renewal policy, Amica never sought to charge Gottlieb more than that agreed-upon $795. Nor did it ever deny him any promised coverage.

Gottlieb nevertheless contends that Amica wronged him when it proposed a coverage limit of $321,000 in negotiating the renewal policy. His principal argument is that the limitation for adjusting the coverage limit in the original policy applied to the setting of the coverage limit in the renewal policy. Like the district court, we disagree.

The 2015-16 policy was a separate contract from the 2016-17 renewal. See Epstein v. Nw. Nat'l Ins. Co., 166 N.E. 749, 750-51 (Mass. 1929) (renewal policies are new contracts). Nothing in the 2015-16 policy's terms indicated that anything in that policy prevented Amica from proposing a new coverage limit for the 2016-17 policy. Gottlieb attempts to evade this hole in his breach of contract claim by highlighting abstract references to renewal policies in the 2015-16 agreement.[1] He claims that these references show that his initial policy governed the terms of any renewal. But the references to renewals govern different procedures for canceling the contract depending on whether the contract is an initial policy or a renewal. They do not suggest that the first policy governs any future renewals. Rather, they simply indicate that some terms of a particular policy apply differently depending on whether the policy itself is a renewal or an initial policy.

Nor does it help Gottlieb that the cover letter accompanying the proposed renewal policy referred to the new

---

[1] For example, the policy provides that it may be cancelled for certain reasons "[w]hen this policy has been in effect for 60 days or more, or at any time if it is a renewal with us." Other references to renewal or nonrenewal indicate what will happen if there is a nonrenewal, e.g., "[i]f we decide to cancel or not renew this policy, that loss payee will be notified in writing," and procedures for renewal or nonrenewal, e.g., "[o]rdinarily we will renew this policy automatically" and "[w]e may elect not to renew this policy . . . by delivering to you . . . written notice."

coverage limit as an adjustment. That reference says nothing about whether the initial policy itself limited Amica in setting the coverage limit for a subsequent policy. The language in the cover letter sent along with the renewal policy does not turn the renewal, which is clearly a new policy, into an "adjust[ment]" as that phrase is used in the language of the endorsement in the first policy.

Gottlieb also claims in passing that "[t]he Homeowners Information Insurance Digest included in Plaintiff's policy also expressly provides the terms of the Endorsement apply to renewal policies." In describing various coverage options, the Digest (which is not a part of the contract) states that policyholders will get the benefit of the endorsement's increased coverage if they "[a]llow [Amica] to issue your policy (and subsequent renewals) in accordance with a current property evaluation." Gottlieb did not mention this Digest in either his initial or amended complaint, nor did he mention it in his briefing on the motion to dismiss. As such, we consider it waived when evaluating his appeal of the district court's decision on the motion to dismiss. See, e.g., P.R. Hosp. Supply, Inc. v. Bos. Sci. Corp., 426 F.3d 503, 505 (1st Cir. 2005). Even if we were to consider Gottlieb's argument, we see no breach of contract. The Digest's language does not require Amica to base the premium of a renewal policy on a current property evaluation. Rather, it states that

an insured will get the benefit of the endorsement if they "comply with" three conditions, including "[a]llow[ing] [Amica] to issue [the] policy (and subsequent renewals) in accordance with a current property evaluation."  That the insured may allow Amica to do that does not mean that Amica must do it.

In sum, because the original policy did not limit Amica's freedom in proposing a coverage limit for the renewal policy, Gottlieb's breach of contract claim fails.  Gottlieb was not entitled under the initial contract to a proposed renewal coverage limit reflecting only inflation or a new property evaluation.[2]

**B.**

Gottlieb's claim for breach of the implied covenant of good faith and fair dealing fares no better.  The covenant of good faith and fair dealing is implied in all contracts under Massachusetts law.  Guldseth v. Fam. Med. Assocs. LLC, 45 F.4th 526, 537 (1st Cir. 2022).  It provides that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Latson v. Plaza Home Mortg., Inc., 708 F.3d 324, 326 (1st Cir. 2013) (quoting Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 820 (Mass. 1991)).  The implied covenant is not, however, a catch-all for altering the terms or scope of a contract.

---

[2]  We therefore do not address Gottlieb's various claims that Amica used the wrong measure of inflation.

- 10 -

"Because the implied covenant is all about the expectations concerning the obligations actually in the contract, the scope of the covenant is only as broad as the contract that governs the particular relationship." Guldseth, 45 F.4th at 537; see also Uno Rests, Inc. v. Bos. Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004) ("The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.").

As we concluded above, the limitation on Amica's changes to the dwelling limit during the term of the original policy did not apply to the setting of the initial coverage limit in the renewal policy. Given that conclusion, Gottlieb cannot claim to have had any reasonable expectation to the contrary. Guldseth, 45 F.4th at 537–38. The covenant of good faith and fair dealing therefore does not secure this benefit that the contract never guaranteed in the first place. Nor did Amica do anything to deprive Gottlieb of the reasonably expected benefits of the policy.

Gottlieb lists several other acts that he contends show that Amica breached the implied covenant of good faith and fair dealing. As an initial matter, some of these contentions have no footing in either the complaint or the response filed in the district court to the motion to dismiss, so those arguments are

not part of our review of the dismissal of Gottlieb's claim for breach of the implied covenant of good faith and fair dealing. But the rest merely restate Gottlieb's claim that the contract guaranteed a specific methodology to set his renewal coverage limit, and that Amica failed to follow that methodology. Having rejected the first premise, we also reject the second.

In particular, we do not find (as Gottlieb argues) that any contractual language obligated Amica to set Gottlieb's coverage limit for an upcoming policy year based only on "current" inflation (i.e., not based on any projection of future inflation). Gottlieb points to the language in the endorsement allowing Amica to increase the Coverage A limit based on "any increases in inflation," but the word "current" does not appear in this excerpt. He also points to the Digest, which he says requires Amica to issue the Coverage A limit in accordance with "'current' reconstruction costs." But as we have already concluded, the Digest does not require Amica to do anything. And the absence of any restriction on Amica's ability to use future projections in calculating coverage limits makes sense, because Amica must insure the covered dwelling up to the end of the coming policy year. So we cannot say it was a breach either of the contract or the implied covenant of good faith and fair dealing for Amica to set the limit using a projection for the anticipated year.

Finally, Gottlieb contends that Amica sold him illusory coverage that he could never use. We will address this argument in analyzing Gottlieb's remaining claims, to which we turn next. We begin with Gottlieb's claims for unjust enrichment and money had and received, and then move to his claim for unfair trade practices in violation of Chapter 93A.

## C.

Gottlieb's equitable claims must fail as well. Massachusetts law "does not allow litigants to override an express contract by arguing unjust enrichment." Reed v. Zipcar, Inc., 883 F. Supp. 2d 329, 334 (D. Mass. 2012) (quoting Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 130 (1st Cir. 2006)); Guldseth, 45 F.4th at 541 (unjust enrichment not available as a remedy when a valid contract governs the relationship between the parties and sets out their obligations). This also applies to money had and received claims, which have "the same elements" as unjust enrichment, but are limited to enrichment by money or its equivalent. Jelmoli Holding, Inc. v. Raymond James Fin. Servs., Inc., 470 F.3d 14, 17 n.2 (1st Cir. 2006). Despite Gottlieb's argument to the contrary, the policy plainly governs the relationship between the parties and the subject matter of the dispute (Gottlieb's premium), so Gottlieb's equitable claims are foreclosed here.

That leaves Gottlieb's Chapter 93A claim. Chapter 93A prohibits unfair or deceptive acts or practices in trade and commerce. In determining whether a practice is unfair, courts look to "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir. 2005) (alterations in original) (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975)). Courts consider "[a]n act or practice . . . deceptive if it 'has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently" than they otherwise would have. Tomasella v. Nestlé USA, Inc., 962 F.3d 60, 71 (1st Cir. 2020) (quoting Aspinall v. Philip Morris Cos., 813 N.E.2d 476, 488 (Mass. 2004)). To succeed on a claim based on a deceptive act or practice, a consumer must show "(1) a deceptive act or practice on the part of the seller; (2) an injury or loss suffered by the consumer; and (3) a causal connection between the seller's deceptive act or practice and the consumer's injury." Id. (quoting Casavant v. Norwegian Cruise Line, Ltd., 919 N.E.2d 165, 169 (Mass. App. Ct. 2009)). Importantly, in order to obtain

relief under this statute for either an unfair or a deceptive act, plaintiffs must show that they were injured by the conduct at issue, and that the conduct caused some loss beyond the mere fact that a violation occurred.  Shaulis v. Nordstrom, 865 F.3d 1, 10 (1st Cir. 2017); Hershenow v. Enterprise Rent-A-Car Co. of Bos., 840 N.E.2d 526, 528 (Mass. 2006).

The only arguably deceptive statement by Amica to which Gottlieb points is Amica's statement that "[r]econstruction costs have risen steadily since our last survey of your home."  Gottlieb claims that Amica's consultant reported a decrease in costs rather than an increase, rendering false the statement that costs had risen, and the district court credited this statement in its order on the motion granting summary judgment.  Thus, Amica's statement in the cover letter that reconstruction costs had "risen steadily" may well have been deceptive.[3]

---

[3]  Gottlieb also claims that Amica's statements in the cover letter to him would violate Massachusetts General Laws Chapter 176D, § 3(1)(a), which classifies "[m]isrepresent[ing] the benefits, advantages, conditions, or terms of any insurance policy" as an "unfair or deceptive act[] or practice[] in the business of insurance."  The district court correctly noted that there is no private right of action for violations of Chapter 176D, § 3(1)(a).  However, courts have held that plaintiffs may "attempt to state a claim under Chapter 93A, section 2 by alluding to conduct that is impermissible under chapter 176D."  United States ex rel. Metric Elec., Inc. v. Enviroserve, Inc., 301 F. Supp. 2d 56, 70 (D. Mass. 2003) (quoting M. DeMatteo Constr. Co. v. Century Indem. Co., 182 F. Supp. 2d 146, 163 (D. Mass. 2001)); see also M. Dematteo Constr. Co., 182 F. Supp. 2d at 160 (concluding that although there is no private right of action under Chapter 176D, that does not end the inquiry as to whether a plaintiff can recover

- 15 -

However, Gottlieb has not shown that he was injured by this statement. He argues that he has been injured because the higher coverage he purchased was illusory. Amica, he claims, overestimated his reconstruction costs and charged him a correspondingly higher premium, but would only ever pay actual reconstruction costs far below this overestimate. It could therefore pocket the difference, enriching itself and harming Gottlieb. He asserts that Amica would never pay the full amount of the coverage limit, because the actual reconstruction costs would never be that high. In so arguing, however, Gottlieb assumes that Amica's very first estimate of reconstruction costs was correct, and that such costs not only decreased during the year covered by that policy (or, at the very least, increased less than the increase represented by the new coverage limit), but could not possibly rise during the year to be covered by the second policy. Without evidence that such a risk was essentially nonexistent at the time of contracting, he cannot prove that insurance coverage protecting him from that risk was illusory. And Gottlieb has failed to show that he was entitled to a policy accounting only for changes in costs in the previous year, as opposed to changes through the upcoming year for which he would be insured.

---

under Chapter 93A for a violation of Chapter 176D). However, we decline to determine whether Amica's statements would violate Chapter 176D, § 3(1)(a) because Gottlieb's failure to show injury would nonetheless prove fatal to a Chapter 93A claim.

Gottlieb attempts to sidestep the gap in his evidence by claiming that the approximately $16 increase in his premium resulting from the allegedly wrongfully calculated increase in his Coverage A liability limit represents his damages from Amica's wrongful acts. But this merely states the amount by which his premium increased due to the higher coverage limit. It does not itself show why Amica's estimate was so high that it would never have to pay the full amount of the coverage limit.

The closest Gottlieb comes to estimating what his coverage limit should have been is to assume that his "correct" reconstruction costs were the original coverage limit, to which he adds "any increase due to inflation allowed under the terms of the Policy." But as we have already explained, Gottlieb is not entitled to such a calculation under the Policy. And there is no evidence that this calculation would have produced the "true" cost of reconstruction.

Gottlieb also points to Amica's rate filing with the Massachusetts Department of Insurance, which reported a "premium trend factor" of approximately 1%. At oral argument, Gottlieb's counsel argued that this estimate premium trend factor represented inflation, and he pointed out that it was far lower than the amount by which Gottlieb's premium had increased. This argument was raised for the first time on reply, and thus, absent exceptional circumstances, we consider it waived. See, e.g., Alamo-Hornedo v.

- 17 -

Puig, 745 F.3d 578, 582 (1st Cir. 2014). We see no exceptional circumstances here. Moreover, Amica's counsel explained that the premium trend factor measures Amica's losses across the board, rather than general reconstruction cost increases or inflation. We cannot find any indication in the record that this premium trend factor estimates inflation. And, in any event, evidence that replacement costs may have increased less than Amica's estimate does not suffice to show that Gottlieb's coverage limit was so high as to provide illusory coverage.

Finally, to the extent Gottlieb argues that he was fraudulently induced to renew the policy based on the deceptive statement that reconstruction costs had risen, he has not pointed to any evidence that he would have done anything differently, such as seeking alternative coverage or forgoing coverage altogether absent this statement.

In sum, we are unable to conclude that Amica by deception sold Gottlieb coverage he could never use. He has thus not shown that he was injured as required for a 93A claim.

## III.

For the foregoing reasons, we affirm the orders of the district court.